UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

Jason Balkum (and all others similarly situated),

                                        Plaintiff,

    -v.-                                                6:06-cv-1467

Donald Sawyer, Sharen Barbosa, and Nikhili Nihalani,

                                        Defendants.

APPEARANCES

JASON BALKUM
*Plaintiff Pro Se*
352 Hayward Avenue
Apartment 2
Rochester, NY 14609

ERIC T. SCHNEIDERMAN                    C. HARRIS DAGUE, ESQ.,
ATTORNEY GENERAL OF                     Assistant Attorney General
THE STATE OF NEW YORK
*Attorneys for Defendants*
The Capitol
Albany, NY 12224-0341

NEAL P. MCCURN
*Senior United States District Judge*

## Memorandum, Decision, and Order

## I.  Introduction

        Presently before the court in this civil rights action is a motion for summary

1

judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, dismissing the entire action.  Plaintiff opposes the motion.  Decision on the pending motion is based entirely on the submitted papers, without oral argument.  For the reasons that follow, defendants' motion is granted.

## II.  Procedural Background

Plaintiff Jason Balkum ("Balkum") brings this civil rights action pursuant to 42 U.S.C. § 1983, alleging that defendants Donald Sawyer ("Sawyer"), Sharen Barbosa ("Barbosa"), and Nikhil Nihalani ("Nihalani") (collectively "Defendants") violated his rights during his confinement at the Central New York Psychiatric Center ("CNYPC").  See generally Compl., Dkt. No. 1.

Balkum alleges that CNYPC's policies violated his rights under the First, Fourth, Sixth, and Eighth Amendments to the United States Constitution, and he also asserts claims of retaliation and negligent supervision.  See id.

During Sex Offender Treatment Program ("SOTP") orientation, Balkum "inquired [into] purchasing a subscription" to his hometown newspaper.  Id. ¶ 12. The "facilitator" told him that SOTP Director Barbosa implemented a policy that prohibited all SOTP patients from purchasing subscriptions to their hometown newspapers.  Id. ¶ 13.  Balkum claims that this "unwritten policy" violates the First Amendment.  Id. ¶ 14.

Balkum also asserts two Fourth Amendment claims.  The first claim arises from a "strip frisk" that was conducted on Balkum upon his arrival at CNYPC. See Compl. ¶ 9.  Balkum claims that CNYPC staff "told [him] to stand with arms raised, . . . [and] to run [his] fingers through [his] hair, to run [his] fingers through [his] mouth, lift up [his] tongue, bend over and spread [his] buttocks, and lift the bottoms of [his] feet."  Id. ¶ 10.  He alleges that this "illegal search and seizure"

was the result of a policy promulgated by Sawyer, who was at all relevant times the Executive Director of CNYPC.  Id. ¶ 11.

Balkum's second Fourth Amendment claim, Sixth Amendment claim, and retaliation claim, arise from an incident that occurred on November 15, 2006, when CNYPC staff asked Balkum to provide a urine sample for drug testing.  See id. ¶ 18.  Balkum was told that drug testing was required under a policy implemented by Barbosa.  See id. ¶ 19.  Balkum "objected to being required to give a urine sample for testing without first being able to consult with an attorney." Id. ¶ 20. Following Balkum's refusal to give a urine sample, Nihalani, a psychiatrist working at CNYPC, allegedly told Balkum that he faced a future court appearance to determine whether he would be released from CNYPC, and that if Balkum did not give a urine sample, then there would be "something written" in his records "to make it appear as if [he] had something to hide." Id. ¶¶ 21-22.  Balkum claims that these "statements represent an act of threatening [him] with retaliation[.]" Id. ¶ 23.

The Eighth Amendment claim arises from CNYPC's policy of placing patients in handcuffs and ankle shackles while transporting them for medical trips outside of the facility.  See Compl. ¶ 17.  Plaintiff suffered a knee injury, which required surgery, prior to arriving at CNYPC.  See id. ¶ 15.  When he "objected" to the handcuffs and shackles, CNYPC staff told him that they were "only doing their job as per [Barbosa's] instructions 'for transporting you guys." Id. ¶ 16.  Balkum claims that this "illegal policy," which was implemented by Barbosa, "subjected [Balkum] to cruel and unusual punishment in violation of the Eighth Amendment . . . ." Id. ¶ 17.

Finally, Plaintiff asserts a negligent supervision claim against Sawyer because Sawyer "knew or reasonably should have known" that Barbosa's policies

3

violated the First, Fourth, Sixth, and Eighth Amendments.  Compl. ¶¶ 24-26.

In support of their motion for summary judgment, Defendants "do not dispute the existence or application of any policies or procedures alleged to be unconstitutional[.]"  Defs.' Mem. of Law at 4, Dkt. No. 42-3.  They "acknowledge" that new residents are subjected to a strip search upon admission and random drug testing throughout their stay, prohibited from subscribing to their hometown newspapers and other periodicals, and handcuffed and shackled during transport outside of the facility.  Id.  Defendants contend that these policies comport with the Constitution.  Id.  Alternatively, Defendants argue that they are entitled to qualified immunity.  Id. at 28.

### III.  Factual Background

The following facts are undisputed.

Balkum was convicted of sex offenses in May 1994.  On or about September 12, 2006, before Balkum's release from the custody of the Department of Correctional Services ("DOCS"), the Superintendent of the Coxsackie Correctional Facility ("Coxsackie") filed an Application for Involuntary Admission on Medical Certification under New York Mental Hygiene Law § 192 with the Central New York Psychiatric Center ("CNYPC").  See Ex. A to Aff. of Terri Maxymillian, Nov. 17, 2009, at 1, Dkt. Nos. 42-5 and 43-2 ("Maxymillian Aff.").  The Superintendent filed the application because, he alleges, Balkum had a "history of exhibiting violent behavior towards others," denied that he was guilty of the charges of which he was convicted, and "refused to participate in mandated sex offender treatment."  Id. at 1.  Following a diagnosis by two physicians that Balkum had antisocial personality disorder and the physicians' conclusion that Balkum remained "a high risk for re-offending and for being a danger to the

community," CNYPC Executive Director Sawyer filed an application with the Oneida County Supreme Court to "retain [Balkum] for involuntary care and treatment" at CNYPC. Id. at 3-4, 7. Balkum was then involuntarily committed to CNYPC, and placed in its SOTP. Balkum's confinement at CNYPC began in September 2006, and he was released from CNYPC in or about September 2007. See Ex. B to Maxymillian Aff., at 1-2, Dkt. No. 42-7.

## IV.  Discussion

### A.  Summary Judgment Standard

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant has the initial burden to show why it is entitled to summary judgment. See Salahuddin v. Goord, 467 F.3d 263, 272 (2d Cir. 2006) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986)). If the movant meets its burden, the burden shifts to the non-movant to identify evidence in the record that creates a genuine issue of material fact. See id. at 273 (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348 (1986)). A party's factual assertions must be supported by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1).

When deciding whether a material issue of fact is in dispute, the court is cognizant that "[a] fact is material when it might affect the outcome of the suit under governing law." Tracy v. Freshwater, 623 F.3d 90, 95 (2d Cir. 2010) (internal citation omitted).  Also, a material fact is genuinely in dispute "if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Bessemer Trust Co., N.A. v. Branin, 618 F.3d 76, 85 (2d Cir. 2010) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505 (1986)).

"In ruling on a motion for summary judgment, the district court may rely on any material that would be admissible or usable at trial." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008) (internal quotation and citation omitted).  When deciding a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor.  Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004) (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598 (1970)).  However, a properly supported summary judgment motion "will not be defeated merely upon a 'metaphysical doubt' concerning the facts . . . or on the basis of conjecture or surmise." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., 475 U.S. at 586).

Finally, it should also be noted that, pursuant to Local Rule 7.1(a)(3), the court deems admitted any properly supported statement of material fact that is not specifically controverted by the opposing party.  See N.D.N.Y. L.R. 7.1(a)(3); see also Figueroa v. Tri-City Highway Prods., Inc., No. 08-CV-868, 2010 WL 3635247, at *2 (N.D.N.Y. Sept. 10, 2010) (citations omitted).

### B.  42 U.S.C. § 1983 Generally

In order to establish a claim pursuant to 42 U.S.C. § 1983, a plaintiff must show "(1) that some person has deprived him of a federal right, and (2) that the person who has deprived him of that right acted under color of state . . . law." Velez v. Levy, 401 F.3d 75, 84 (2d Cir. 2005) (quoting Gomez v. Toledo, 446 U.S. 635, 640, 100 S. Ct. 1920 (1980) (internal quotations omitted)). "Section 1983 is not itself a source of substantive rights[,] but merely provides a method for vindicating federal rights elsewhere conferred[.]" Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3, 99 S. Ct. 2689 (1979)).

To establish a § 1983 claim against a government official in his individual capacity, a plaintiff need only "show that the official, acting under color of state law, caused the deprivation of a federal right." Hafer v. Melo, 502 U.S. 21, 25, 112 S. Ct. 358, 362 (1991) (quoting Kentucky v. Graham, 473 U.S. 159, 166, 105 S. Ct. 3099, 3105 (1985)). The government official, for his part, may assert the personal immunity defense of qualified immunity. See id.

In the case at bar, it is undisputable that Defendants were acting under color of state law when they took the alleged unconstitutional actions.

### 1. Sawyer's Personal Involvement

Defendants argue that Sawyer was not personally involved in the alleged unconstitutional actions. A prerequisite to an award of damages on a § 1983 claim against an individual is the personal involvement of the individual in the alleged unconstitutional deprivation. See Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (citations omitted). To prevail, the plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant. Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986). Where a defendant is a supervisory

7

official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior*) is insufficient to show his personal involvement in that unlawful conduct.  Polk County v. Dodson, 454 U.S. 312, 325, 102 S. Ct. 445 (1981); Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003).  A plaintiff may establish the personal involvement of a supervisor by showing that the supervisor

> (1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated.

Iqbal v. Hasty, 490 F.3d 143, 152-53 (2d Cir. 2007) (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995)) (rev'd on other grounds, Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937 (2009)).

Defendants argue that Balkum "makes no allegations of personal involvement by [Sawyer] throughout [the] entire Complaint."  Defs.' Mem. of Law at 31.  The Complaint, however, states that the "strip frisk" was the result of an "unwritten policy implemented by Defendant Sawyer . . . ."  Compl. ¶ 11.  Sawyer admitted at his deposition that he is involved in "discussions" on "developing policies and procedures," and that there are a "small number" of policy changes that require his approval.  Dep. of Donald A. Sawyer, Ph.D., Apr. 17, 2009, at 35 ("Sawyer Dep."), at Ex. A to Decl. of Kevin M. Hayden, Jan. 22, 2010, Dkt. No. 50 ("Hayden Decl.").  Implementing a policy that led to the "strip frisk" is sufficient to show Sawyer's personal involvement in an alleged constitutional

deprivation.[1]

Accordingly, Defendants should not be granted summary judgment as to the claims against Sawyer on this basis.

### 2. *Restrictions on News Media*

Balkum's First Amendment claim arises from Barbosa's policy of preventing CNYPC patients from subscribing to their hometown newspapers. Compl. ¶¶ 12-14. "[P]rison inmate[s] retain[] those First Amendment rights that are not inconsistent with their status as . . . prisoner[s] or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822, 94 S. Ct. 2800 (1974). The Supreme Court has also declared that involuntarily committed persons "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." Youngberg v. Romeo, 457 U.S. 307, 322, 102 S. Ct. 2452 (1982). As such, "there can be little doubt that civilly committed persons also retain certain First Amendment rights[.]" Yeldon v. Hogan, No. 9:08-CV-769, 2010 WL 983819, at *7 (N.D.N.Y. Mar. 15, 2010), aff'd, 400 F. App'x 580 (2d Cir. 2010).

But neither the Supreme Court nor the Second Circuit has yet to determine "the appropriate standard to be applied when a person who is civilly committed challenges an action or policy on First Amendment grounds[.]" Yeldon, 2010 WL 983819, at *7. The Supreme Court in Turner v. Safley, 482 U.S. 78, 89-91, 107 S. Ct. 2254 (1987), established a balancing test where courts analyze four factors to determine whether prohibitions on a prisoner's exercise of his or her constitutional rights is permissible. Id. The four factors are:

---

[1] Whether the policy is unconstitutional is discussed below. See Point III(e)(1) infra.

> (1) whether prohibiting an inmate from exercising a constitutional right is rationally related to a legitimate governmental interest; (2) whether there are alternative means of exercising that right; (3) what effect accommodation of the interest would have on guards, other inmates, and the allocation of prison resources; and (4) whether there are ready alternatives available that continue to serve the prison's interest without impinging constitutional rights.

Yeldon, 2010 WL 983819, at *7 (citing Turner, 482 U.S. at 89-91).  Courts in this and other circuits have adopted the Turner test to analyze First Amendment claims brought by civilly committed persons.  See, e.g., Rivera v. Rogers, 224 F. App'x 148, 151 (3d Cir. 2007) (per curiam) (applying Turner where patient civilly confined following completion of prison sentence for sex offenses challenged the civil facility's policy of inspecting packages); Hydrick v. Hunter, 449 F.3d 978, 994-95 (9th Cir. 2006) (using Turner to support the proposition that, "[a]s is the case with prisoners, civilly committed persons certainly retain those First Amendment rights not inherently inconsistent with the circumstances of their detention"); Graham v. Sharp, No. 10-5563, 2011 WL 2491347, at *11 (D.N.J. June 20, 2011) (applying Turner where civilly confined patient challenged the facility's policy of inspecting mail); Yeldon, 2010 WL 983819, at *7 (using Turner where SOTP patient civilly confined at CNYPC challenged restrictions on his phone, mail, and news media).

"[T]he First Amendment analysis under Turner mirrors the due process analysis under Youngberg" because "in both instances, courts must balance the constitutional interests of confined persons against the legitimate interests of the state-run institution in which they reside."  Yeldon, 2010 WL 983819, at *7 (citing Beaulieu v. Ludeman, No. 07-CV-1535, 2008 WL 2498241, at *20 n.15 (D. Minn.

June 18, 2008) (finding <u>Turner</u> to be consistent with <u>Youngberg</u> because "it will not allow a Program detainee's right to be restricted unless there is a valid institutional reason for doing so").

Thus, the court will use the <u>Turner</u> test to analyze Balkum's First Amendment claim.  Balkum complains that CNYPC residents have "been denied a request to purchase a subscription of the newspaper from their hometown" because of Barbosa's policy.  Compl. ¶ 13.  CNYPC had a policy for SOTP patients that "limited [patients'] access to hometown newspapers[.]"  Maxymillian Aff. ¶ 17.  The rationale behind this policy was to "limit[] information about [a] resident's former victim, or the victim's family members."  <u>Id.</u> ¶ 21.  "This information, if seen by residents or forensic unit patients, could create a safety concern."  <u>Id.</u> ¶ 20.

CNYPC's policy of limiting a patient's access to their hometown newspapers is rationally related to the legitimate interest of protecting the victim or the victim's family members.  <u>See</u>  <u>Yeldon</u>, 2010 WL 983819, at *9 (holding that CNYPC's limitation on patients' access to local newspapers was rationally related to the legitimate interest of protecting information about CNYPC staff and their families).  Moreover, it does not appear that the restriction on newspapers was overly broad as Balkum was denied access only to his hometown newspaper, and not all newspapers.

Accordingly, Defendants' motion for summary judgment as to Balkum's First Amendment claim, comprising the second cause of action, is granted.

### 3.  *The Strip Search and Request for Urine Sample*

The Fourth Amendment claims arise from CNYPC's policy of strip searching a patient upon his admission to CNYPC and CNYPC's policy of conducting random drug tests on patients.  Compl. ¶¶ 9-11, 18-20.  The Fourth

Amendment provides that "[t]he right of the people to be secure in their persons against unreasonable searches and seizures, shall not be violated . . . ."  U.S. CONST. amend. IV.; see also Bell v. Wolfish, 441 U.S. 520, 558, 9 S. Ct. 1861 (1979).  Balkum, as an involuntarily committed patient, is entitled to "some" Fourth Amendment protections.  Groves v. New York, No. 9:09-CV-0412, 2010 WL 1257858, at *5 (N.D.N.Y. Mar. 1, 2010).  "[C]ourts have recognized that although civilly committed patients do not have an expectation of privacy equal to an individual in society generally, they do not 'check their constitutional rights at the door.'" Id. (quoting Aiken v. Nixon, 236 F. Supp. 2d 211, 233 (N.D.N.Y. 2002)).  An involuntarily committed person's privacy expectation must be balanced against "the societal interest in protecting the health, safety, and welfare of the patients and staff of these units who would be detrimentally affected without sufficient precautionary measures."  Aiken, 236 F. Supp. 2d at 232-33 (citing Jennings v. New York State Office of Mental Health, 786 F. Supp. 376, 382-84 (S.D.N.Y. 1992)).

"Courts in the this Circuit have recognized civil confinement as a 'special circumstance' that removes the warrant and probable cause requirements that normally apply to all government searches under the Fourth Amendment in lieu of the more realistic 'reasonableness' test."  Brooks v. New York, No. 9:09-CV-743, 2010 WL 5856008, at *4 (N.D.N.Y. Aug. 11, 2010) (citing Aiken, 236 F. Supp. 2d at 231).

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case, it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted,

> the justification for initiating it, and the place in which it is
> conducted.

Bell, 441 U.S. at 559 (citations omitted).  Restrictions on a civilly confined

individual's constitutional rights are permissible so long as the restrictions are not

a form of punishment.  Id. at 561.  Determining whether a restriction constitutes

"punishment in the constitutional sense depends on whether they are rationally

related to a legitimate nonpunitive governmental purpose and whether they appear

excessive in relation to that purpose."  Id.

### *a.  The Strip Search*

On September 14, 2006, upon his admission into CNYPC, Balkum was

subject to a strip search.[2]  Dep. of Jason Balkum, Nov. 18, 2008 at 43-44, at Ex. D

to Hayden Decl., Dkt. No. 50-4 ("Balkum Dep.").  CNYPC's policy required

"residents [to be] strip searched upon entrance into the facility."  Defs.' 7.1

Statement ¶ 26, Dkt. No. 42-1.  The search required residents to remove their

clothing and be subject to a visual inspection for contraband, but it did not include

a body cavity search.  Id. ¶¶ 27-28.  Balkum admits that there was no body cavity

search.  Balkum's 7.1 Statement at 7.  He states that he was required to remove his

clothing, run his fingers through his hair, open his mouth and bend over.  Aff. of

Jason Balkum, Jan. 21, 2010, at ¶ 5, Dkt. No. 51 ("Balkum Aff.").  Balkum was

not searched in this manner at any other time during his confinement at CNYPC.

See Balkum Dep. at 44.

CNYPC implemented this policy to reduce the introduction of contraband,

---

[2]  Balkum labels the body inspection as a "strip frisk" rather than a "strip search."
Balkum's Mem. of Law at 15.  This label is immaterial.  The court must construe all ambiguity
in the non-movant's favor, and thus, the court will analyze the constitutionality of the search as it
was described by Balkum.

including weapons, drugs, and pornography into the facility.  Defs.' 7.1 Statement ¶¶ 30, 33.  Balkum claims that this policy, implemented by Sawyer, violates the Fourth Amendment.  Compl. ¶ 11.  CNYPC's policy is rationally related to facility security and should survive constitutional scrutiny.  See, e.g., Bell, 441 U.S. 520 (upholding policy of strip searching pretrial detainees "after every contact visit [a pretrial detainee had] with a person from the outside" because the policy was designed to discover and deter the smuggling of contraband, including weapons and drugs).

Balkum, however, argues that the strip search upon his admission into CNYPC is redundant, and thus, presumptively unreasonable.  Balkum's Mem. of Law at 14.  Where a subsequent strip search is conducted shortly after an earlier strip search and the detainee has been under constant supervision by facility personnel between the searches, the subsequent search may be unnecessary and unreasonable.  Hodges v. Stanley, 712 F.2d 34, 35 (2d Cir. 1983).  Under those circumstances there is "no possibility" that the detainee could "obtain[] and conceal[] contraband."  Id.; Duamutef v. Leonardu, No. 91-CV-1100, 1993 WL 428509, at *5 (N.D.N.Y. Oct. 22, 1993) ("a redundant or wholly unnecessary strip frisk is presumptively unreasonable") (footnote and citations omitted);.  See also Morgan v. Ward, 699 F. Supp. 1025, 1052 (N.D.N.Y. 1988) (finding a prison's "policy of requiring strips searches before [and after] contact visits unreasonable" because the prisoners "were confined in Spartan cells without many of their personal belongings, [and] the danger of smuggling something *out* of the prison was nonexistent") (emphasis in original).

Balkum claims that this search was redundant because he was "strip frisked upon leaving" Coxsackie, and that he was transported to directly CNYPC by

14

"prison guards."  Balkum Aff. ¶ 7.  He states that he "was never out of sight from the guards," that he "was the only prisoner being transported," and that he "never interacted with anyone else before being admitted to SOTP."  Id.

Defendants do not dispute these factual assertions.  Rather, they argue that Hodges, Morgan, and Duamutef are distinguishable from the instant case.  See Defs.' Mem. of Law at 9.  Defendants argue that the strip searches in those cases were conducted "consecutively within the same facility when an inmate was transferred from general population to [the] special housing unit . . . and before and after an inmate had an outside visitor[.]"  Id.  But here, Defendants point out, the second strip search occurred after Balkum was transferred from DOCS custody to CNYPC's custody, and from one facility to a another facility.  See id.

Subsequent strip searches at another facility are unreasonable where an earlier strip search was conducted immediately before the individual left the first facility, and the individual was transferred to the second facility while under constant supervision.  See N.G. v. Connecticut, 382 F.3d 225, 233-34 (2d Cir. 2004) (citing Hodges, 712 F.2d at 35).  In N.G., the individuals remained under the continuous custody of Connecticut's Court Support Services Division.  Id. at 227.  Here, there was both a change in facility and a change in custody.

The court has been unable to find any authority to suggest that the change in custody affects the determination of whether subsequent strip searches are unreasonable.  In the absence of any authority to suggest otherwise, a reasonable jury could find that the second search at CNYPC was unreasonable and unnecessary.  Accordingly, Sawyer is not entitled to summary judgment on this basis.  But as discussed more fully below, Sawyer is entitled to qualified

immunity.[3]

### b. The  Drug Test[4]

On November 16, 2006, Nihalani asked Balkum to provide a urine sample to determine whether Balkum had been using illegal drugs.  Balkum claims that this policy, implemented by Barbosa, violates the Fourth Amendment.  CNYPC implemented a policy of voluntary drug tests on its residents because "illegal drug use within CNYPC by patients and residents occurs with relative frequency and is a considerable problem."  Maxmillian Aff. ¶¶ 22, 24.  The drug tests are "conducted at the discretion of the resident's treatment team and may be requested due to suspicion of a resident's drug use."  Id. ¶ 23.  Testing for drug use "enhances staff safety, decreases the amount of drugs present in the facility and provides staff with an opportunity to identify residents and patients who have drug problems who could use assistance."  Id. ¶ 27.  Testing SOTP residents for drug use also serves the purpose of the sexual offender treatment program as drugs "can be one of the main triggers that the sex offender behavior therapy works to remove so as to decrease the rate of recidivism."  Id. ¶ 28.

Here, the drug testing policy was a reasonable response to deter and reduce drug use for the purpose of facilitating treatment goals and ensuring the safety of CNYPC staff, residents, and patients.  There has been no showing that this policy

---

[3]  See Point IV(B)(8) infra.

[4]  In response to Defendants' summary judgment motion, Balkum argues that it is "immaterial" whether CNYPC's drug test policy was constitutional.  Balkum's Mem. of Law at 16.  Rather, he argues that he should have been allowed to consult with an attorney before being forced to provide a urine sample.  See id. at 16-17.  In his Complaint, however, the fourth cause of action challenges the constitutionality of the drug test policy under the Fourth Amendment, and the second cause of action asserts a denial of the right to counsel under the Sixth Amendment.  Compl. ¶¶ 18-23.  Accordingly, the court will evaluate both issues.

was an exaggerated response to a security threat or instituted to punish Balkum or other residents.

Accordingly, Defendants' motion for summary judgment as to Balkum's Fourth Amendment claim arising from the request for a urine sample, comprising the fourth cause of action, is granted.

### *4.  Denial of Counsel*

Plaintiff's Sixth Amendment claim arises from an incident on November 16, 2006, when Nihalani and other CNYPC employees allegedly forced Balkum to give a urine sample without first being able to speak with an attorney.  The Sixth Amendment states in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defen[s]e."  U.S. CONST. amend VI.  "The Sixth Amendment by its terms applies only to 'criminal prosecutions,'" Caltagirone v. Grant, 629 F.2d 739, 748 n.19 (2d Cir. 1980) (citation omitted).  The right to counsel under the Sixth Amendment "extends only to criminal and quasi-criminal proceedings."  In re Martin-Trigona, 737 F.2d 1254, 1260 (2d Cir. 1984) (citations omitted).

Balkum was not subject to a criminal or quasi-criminal prosecution when CNYPC staff asked him to provide a urine sample.  Thus, Balkum is not entitled to the protections of the Sixth Amendment.

Accordingly, Defendants' motion for summary judgment as to Balkum's Sixth Amendment claim, comprising the fifth cause of action, is granted.

### *5.  Use of Restraints during Transports*
#### *a.  Facial Challenge to the Restraint Policy*

Balkum asserts an Eighth Amendment claim arising from CNYPC's policy of handcuffing and shackling the ankles of patients while they are transported

17

outside of the facility for medical trips.  The Eighth Amendment's prohibition of "cruel and unusual punishment" applies only to those who have been convicted of a crime and sentenced, and are thus suffering the "punishment" contemplated by the Cruel and Unusual Punishment Clause.  Benjamin v. Fraser, 343 F.3d 35, 49-50 (2d Cir. 2003).  Because Balkum's claim arises from his time as an involuntarily committed individual and not as a prisoner, Balkum's claim should be analyzed under the Fourteenth Amendment's Due Process Clause.  See Youngberg, 457 U.S. at 315-16.  See also Greenholtz v. Neb. Penal & Corr. Complex, 442 U.S. 1, 18, 99 S. Ct. 2100 (1979) (Powell, J., concurring in part and dissenting in part) ("Liberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary government action.").

A state "has the unquestioned duty to provide reasonable safety for all" those confined within the state's mental health institutions.  Youngberg, 457 U.S. at 324.  The state "may not restrain residents except when and to the extent professional judgment deems this necessary to assure such safety."  Id.  A decision made by a professional is "presumptively valid," and "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment."  Id. at 323-24. A "'professional' decisionmaker . . . [is] a person competent, whether by education, training or experience, to make the particular decision at issue."  Id. at 323 n.30.

CNYPC's use of restraints to prevent escapes and ensure the safety of others is presumptively valid.  William F. Owen ("Owen") is CNYPC's Chief Safety Officer.  Aff. of Owen, Nov. 17, 2007, ¶ 1, Dkt. No. 42-11 ("Owen Aff.").  His

18

"duties include general oversight of the safety department at the facility," including the "transportation of SOTP residents and forensic unit patients outside of the facility." Id. ¶ 2. As such, he is competent by virtue of his experience to make safety-related decisions. In his "judgement [and] experience," the "application of physical restraints is a necessary and appropriate means to ensure the safe transport of SOTP residents." Id. ¶ 10.

Under CNYPC's policy, all patients being transported outside of the facility will be restrained with handcuffs, waist chains, and leg shackles. Ex. A to Owen Aff. at 2-3, Dkt. No. 42-12. Using "handcuffs and leg shackles [are] the most effective means of ensuring both the safety of the limited security staff accompanying the resident during transport, and the safety of the general public encountered during transported." Owen Aff. ¶ 7. Restraints are also used "to minimize escape opportunities." Id. ¶ 8. Residents in SOTP "represent flight risks" because they "are involuntarily committed against their will[] in a maximum security facility." Id. ¶ 9. Balkum has not shown that the use of restraints in this manner and for this purpose represents a substantial departure accepted professional judgment, standards, or practice.

Accordingly, Defendants' motion for summary judgment as to Balkum's facial challenge to the restraint policy, comprising the third cause of action, is granted.

### *b. As Applied Challenge to the Use of Restraints*

In his Complaint, Balkum made a facial challenge to the constitutionality of the restraint policy. Compl. ¶ 17. But in his opposition to Defendants' motion for summary judgment Balkum posits an as applied challenge to the use of restraints. He argues that the use of restraints amounted to deliberate indifference in violation

of the Eighth Amendment and excessive force in violation of the Fourth
Amendment.  See Balkum's Mem. of Law at 7-8.

"An opposition to a summary judgment motion is not the place for a plaintiff
to raise new claims."  Lyman v. CSX Transp., Inc., 364 F. App'x 699, 701 (2d Cir.
2010) (citation omitted).  The Complaint did not allege a Fourth Amendment claim
arising from the use of restraints.  Balkum also stated at his deposition there is no
relation between the knee injury and the use of restraints, and that he did not suffer
any injuries as a result of the restraints.  Balkum Dep. at 71, 74.  Permitting
Balkum to change the landscape of his claims at such a late stage of the action,
especially after he explicitly stated at his deposition that the claim was not
premised on his preexisting injury, could unduly prejudice Defendants.  See
Abdul-Matiyn v. Allen, No. 06-CV-1503, 2010 WL 3880510, at *4 & n. 9
(N.D.N.Y. Sept. 28, 2010) [collecting cases].  But in the interest of thoroughness
and in light of Balkum's *pro se* status when he drafted the Complaint, the court
will also address the merits of the new arguments.[5]  The risk of undue prejudice to
Defendants is minimal because they have responded to Balkum's new arguments.
See Defs.' Supplemental Mem. of Law at 4-6, Dkt. No. 52.

Balkum claims that use of restraints amounted to deliberate indifference to a
serious medical need in violation of the Eighth Amendment because he had a
preexisting knee injury.  Balkum was not prisoner in DOCS custody at the time the
restraints were applied.  Thus, his deliberate indifference claim should be analyzed

---

[5]  The Second Circuit has directed District Courts to construe *pro se* pleadings "liberally"
and "to raise the strongest arguments that they 'suggest.'"  See Triestman v. Fed. Bureau of
Prisons, 470 F.3d 471, 477 (2d Cir. 2006) (citations omitted).  Balkum states in the Complaint
that he "was suffering from a knee injury that [he] had received prior to arriving at" CNYPC.
Compl. ¶ 15.  He was transported to outside medical facilities to treat the knee injury.  Id.

under the Fourteenth Amendment's Due Process Clause.  See Youngberg, 457 U.S. at 315-16.  The standards for evaluating deliberate indifference to a person in custody are identical whether under the Eighth Amendment or Fourteenth Amendment.  Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009).

Assuming that the knee injury was sufficiently serious, Balkum has not shown that Barbosa acted with deliberate indifference.  A defendant acts with deliberate indifference when he knows of and disregards an "excessive risk to [a plaintiff's] health and safety and that [the defendants were] both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and also drew the inference."  Caiozzo, 581 F.3d at 72 (internal quotation marks and alterations omitted).

Here, there is no indication that Barbosa was aware that Balkum had a preexisting knee injury when she implemented the policy, and there is no indication that she implemented the policy for the sole purpose of causing harm to Balkum.

Balkum also claims that the use of restraints amounted excessive force in violation of the Fourth Amendment.  See Balkum's Mem. of Law at 12.  In a Fourth Amendment excessive force claim, a court must determine whether an officer's use of force is "'objectively reasonable' in light of the facts and circumstances confronting [him or her], without regard to [his or her] underlying intent or motivation."  Graham, 490 U.S. at 397 (citing Scott v. United States, 436 U.S. 128, 137-39, 98 S. Ct. 1717 (1978)).

Balkum's reliance on the "objective reasonableness standard in his excessive force claim is misplaced.  The "objective reasonableness" standard applies to excessive force claims only when a "free citizen[] claim[s] that law enforcement

21

officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person."[6]  Id. at 388.  It is undisputed that Balkum was involuntarily civilly confined while at CNYPC, and thus, not a "free individual" for Fourth Amendment purposes.[7]  Moreover, because Balkum was already under CNYPC custody against his will, the use of restraints was not a separate "seizure."

In an excessive force claim brought by an involuntarily civilly committed individual, the appropriate standard is substantive due process under the Fourteenth Amendment, and not objective reasonableness under the Fourth Amendment. "[I]ndividiuals in the non-seizure, non-prisoner environment have a substantive due process right to be free from the use of excessive force by their custodians." Lane v. Carpinello, No. 9:07-CV-0751, 2009 WL 3074344, at *22 (N.D.N.Y. Sept. 24, 2009) (citing Johnson v. Newburgh Enlarged School Dist., 239 F.3d 246, 253 (2d Cir. 2001)).  In evaluating an excessive force claim, factors to be considered include

> the need for the application of force, the relationship between the need and amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

Id. at 251-52 (internal quotation marks and citations omitted).

---

[6]  This court used the "objective reasonableness" standard when discussing the strip search and drug testing claims because the issues presented in those claims were the reasonableness of the "searches."  See Point IV(B)(3) supra.  In this portion of the Memorandum, Decision and Order, the court is evaluating the alleged use of excessive force.

[7]  An involuntary civil confinement itself amounts to a "seizure" under the Fourth Amendment.  See Glass v. Mayas, 984 F.2d 55, 58 (2d Cir. 1993).  But the legality of placing Balkum in CNYPC's custody without his consent is not the subject of the instant litigation.

> If the force was maliciously or sadistically [employed] for
> the very purpose of causing harm in the absence of any
> legitimate government objective and it results in substantial
> emotional suffering or physical injury, the conduct is
> presumptively un-constitutional . . . .  [M]alicious and
> sadistic abuses of government power that are intended only
> to oppress or to cause injury, and serve no legitimate
> purpose unquestionably shock the conscience   . . .
> [C]onduct intended to injure in some way unjustifiable by
> any government interest is the sort of official action most
> likely to rise to the conscience-shocking level.

Id. at 252 (internal quotation marks citations omitted).

As discussed above, the policy of restraining every SOTP resident when he
or she is being transported out of the facility on medical trips serves the legitimate
purpose of deterring and preventing escapes and ensuring the safety of others.  See
Owen Aff. ¶¶ 7-9.  Balkum has not alleged and the record does not show that
Barbosa implemented the restraint policy for malicious or sadistic purposes with
the intention of injury Balkum.  Moreover, as Balkum admits, the restraint policy
applied to "all patients being transported."  Balkum's Mem. of Law at 47.  There is
no showing that the policy was implemented for the very purpose of causing harm
to Balkum.

Accordingly, Defendants' motion for summary judgment as to Balkum's
deliberate indifference and excessive force claims, which the court has construed to
be included in the third cause of action, is granted.

### 6.  Retaliation Claim

In support of his fifth cause of action, Balkum alleges that Nihalani
threatened him with retaliation because Balkum had asked to speak with a lawyer
before providing a urine sample.  Although Nihalani does not mention that Balkum

asked to speak with an attorney, Nihalani admits that he told Balkum that "it might not look good when everything goes to court" to determine whether Balkum would remain in SOTP.  Dep. of Nikhili Nihalani, M.D., July 16, 2009, 33, at Ex. C to Hayden Decl., Dkt. No. 50-3 ("Nihalani Dep.").  Thereafter, Balkum provided a urine sample.  See Balkum Aff. ¶¶ 11-12.

To prove a prima facie case for retaliatory conduct under § 1983, a plaintiff must show (1) that he engaged in protected conduct; (2) that defendants took an adverse action against him; and (3) that there was a causal connection between the protected activity and the adverse action (i.e. the protected conduct was a "substantial or motivating factor" in the defendant's decision to take action against the plaintiff).  Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S. Ct. 568 (1977); Dillon v. Morano, 497 F.3d 247, 251 (2d Cir. 2007); Dawes, 239 F.3d at 492 (2d Cir. 2001).

As previously stated, the drug testing policy was a reasonable response to a legitimate threat, and Balkum did not have a Sixth Amendment right to consult an attorney when asked to provide a urine sample.  See Point IV(B)(3)(b) and Point IV(B)(4) supra.  Thus, even after construing all ambiguities in Balkum's favor, Balkum has failed to satisfy the threshold requirement of a retaliation claim.

Accordingly, Defendants' motion for summary judgment as to Balkum's retaliation claim, comprising the fifth cause of action, is granted.

### 7.  *Negligent Supervision*

Balkum asserts a negligent supervision claim by arguing that Sawyer "knew or reasonably should have known that" Barbosa had implemented policies that infringed upon Balkum's constitutional rights.  Compl. ¶¶ 24-26.  A negligent supervision claim in New York has four elements: (1) negligence; (2) an

employee-employer relationship between the tortfeasor and the defendant; (3) that the defendant-employer "knew or should have known of the employee's propensity for the conduct which caused the injury" before the injury occurred; and (4) that the tort was committed on the employer's premises or with the employer's chattels[.]" Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004) (internal quotation marks and citations omitted).  Negligence under New York law requires a showing (1) that the defendant owed a duty to the plaintiff; (2) that the defendant breached that duty; and (3) an "injury substantially caused by that breach." Lombard v. Booz-Allen & Hamilton, Inc., 280 F.3d 209, 215 (2d Cir. 2002) (citations omitted).

The Complaint does not allege and the record does not reveal any negligent act on the part of Barbosa or Sawyer.  As such, Balkum has failed to satisfy the first element of a negligent supervision claim.  In construing Balkum's claim broadly, it appears that he may be claiming that Sawyer was grossly negligent in supervising Barbosa, a subordinate, who committed the purported constitutional violation.  This argument could be a basis for personal involvement.  Iqbal, 490 F.3d at 152.  However, the court has already concluded that Barbosa's actions were not unconstitutional.

Accordingly, Defendants' motion for summary judgment as to the negligent supervision claim, comprising the sixth cause of action, is granted.

### 8.  Qualified Immunity

Defendants also assert the affirmative defense of qualified immunity.  See Defs.' Mem. of Law at 28.

> [W]hen a defendant official invokes qualified immunity as a defense in order to support a motion for summary judgment, a court must consider two questions: (1) whether

25

the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation.

Tracy v. Freshwater, 623 F.3d 90, 95-96 (2d Cir. 2010) (citing Gilles v. Repicky, 511 F.3d 239, 243-44 (2d Cir. 2007)); Saucier v. Katz, 533 U.S. 194, 208, 121 S. Ct. 2151 (2001) (modified by Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808 (2009)).

"If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Saucier, 553 U.S. at 201. The court has already determined that Barbosa and Nihalani did not violate Balkum's constitutional rights. As such, this discussion is limited to Sawyer's argument that he is entitled to qualified immunity.

To determine if a right is clearly established, a court evaluates

whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful. The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct. Moreover, when faced with a qualified immunity defense, a court should consider the specific scope and nature of a defendant's qualified immunity claim. That is, a determination of whether the right at issue was clearly established must be undertaken in light of the specific context of the case, not as a broad general proposition. Thus, the qualified immunity analysis must be particularized in the sense that the contours of the right must be sufficiently clear that a reasonable official

> would understand that what he is doing violates that right.
> This is not to say that an official action is protected by
> qualified immunity unless the very action in question has
> previously been held unlawful; but it is to say that in the
> light of pre-existing law the unlawfulness must be apparent.

Doninger v. Niehoff, 642 F.3d 334, 345-46 (2d Cir. 2011) (citations and quotations omitted).  This inquiry turns on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken."  Pearson, 555 U.S. at 244 (quoting Wilson v. Layne, 526 U.S. 603, 614, 119 S. Ct. 1692 (1999) (internal quotation marks omitted)).

As previously noted, a second strip search may be unreasonable where it is conducted shortly after an earlier strip search is performed, and the individual has been under constant supervision.  Hodges, 712 F.2d at 35.  This principle extends to situations where the second strip search is conducted after the individual has been transferred to a different facility while under continuous escort and supervision.  N.G., 382 F.3d at 233-34.  But the law is unclear as to whether there is a constitutional violation under the circumstances of this case where the strip search occurs after a change in custody (e.g. from DOCS to CNYPC) and upon the individual's admission into a new facility.  As such, it was objectively reasonable for Sawyer to believe that the policy of strip searching all individuals upon their admission to CNYPC to deter and prevent the introduction of contraband into the facility was in accordance with the law.

Accordingly, the court finds that Sawyer is entitled to qualified immunity, and therefore, summary judgment as to all claims against him is granted.

## *V.  Conclusion*

In accordance with the foregoing discussion, it is

ORDERED that Defendants' motion for summary judgment, <u>see</u> Dkt. No. 42, is GRANTED in its entirety.

The Clerk of the Court is directed to close this case accordingly.

IT IS SO ORDERED.

DATED:     October 21, 2011
           Syracuse, New York

Neal P. McCurn
Senior  U.S. District Judge

28